UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL No. 16-2740 SECTION: "H" (5) |
| **This document relates to:** Cynthia Thibodeaux, No. 16-15859 | ) ) | |

## ORDER AND REASONS

Before the Court is a Motion for Summary Judgment (Doc. 8779). The Court held oral argument on January 9, 2020. For the following reasons, the Motion is **GRANTED**.

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel,[1] that Plaintiffs were administered for the treatment of breast cancer or other forms of cancer. Plaintiffs allege that the drug caused permanent alopecia—in other words, permanent hair loss. Plaintiffs bring claims of failure to warn, negligent misrepresentation, fraudulent misrepresentation, and more. The first bellwether trial was held in September 2019. The second is set for March 23, 2020, and Cynthia Thibodeaux was selected as the plaintiff for this trial.

Plaintiff Cynthia Thibodeaux filed her lawsuit in October 2016, more than six years after she completed chemotherapy treatment and lost her hair. An attorney advertisement describing the alleged link between Taxotere and

---

[1] Docetaxel is the generic version of Taxotere.

permanent hair loss prompted her to file suit. In the instant Motion, Defendants argue that Thibodeaux's claims are prescribed.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] When considering a summary judgment motion, the Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.[4]

## LAW AND ANALYSIS

Defendants argue that summary judgment is warranted for two reasons: (1) the untimeliness of this case is apparent from the pleadings; and (2) the evidence shows that contra non valentem does not apply. Defendants argue that Plaintiff was aware of her alleged injury six months after she completed chemotherapy and that this is when prescription began to run. Defendants point to the Master Complaint in the MDL, defining permanent chemotherapy-induced alopecia ("PCIA") as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."[5] Highlighting the fact that in her Short Form Complaint, Thibodeaux incorporated the Master Complaint by reference, Defendants aver that the prescriptive period began to run six months after Thibodeaux completed chemotherapy. Because she completed her

---

[2] FED. R. CIV. P. 56.
[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[4] Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000).
[5] Doc. 8879-2 (citing Doc. 4407).

2

treatment in June 2009, Defendants aver that the one-year prescription period began to run in January 2010. According to Defendants, when Thibodeaux filed her complaint in October 2016, her case had prescribed. Defendants further argue that contra non valentem does not apply because Plaintiff had reason to investigate her claim but did not. They note that she purchased a new wig every three months but never asked her physicians about her hair loss.

In response, Plaintiff argues that Defendants misread the Master Complaint and erroneously apply a de facto six-month trigger date for purposes of prescription. Disregarding the allegations in the Master Complaint, Plaintiff notes that the Plaintiffs' Steering Committee has repeatedly stated that there is no definitive definition for permanent alopecia. Plaintiff avers, however, that even if her injury is defined using the definition of PCIA in the Master Complaint, there is an issue of fact on whether contra non valentem applies. Plaintiff avers that she reasonably believed her hair would grow back until she saw the attorney advertisement in 2016.

Under Louisiana Civil Code article 3492, the prescriptive period for products liability claims is one year.[6] Generally, the period begins to run from the day the injury or damage is sustained.[7] "If the face of the petition shows that the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred."[8]

The doctrine of contra non valentem "provides some grace for those plaintiffs who are unaware that their injury was caused by a tort."[9] The

---

[6] LA. CIV. CODE art. 3492. *See also In re:* Xarelto (Rivaroxaban) Prods. Liab. Litig., 2017 WL 4517287, *2 (E.D. La. Oct. 10, 2017).
[7] Carter v. Matrixx Initiatives, Inc., 391 Fed. App'x 343, 344 (5th Cir. 2010).
[8] Hoerner v. Wesley-Jensen, 684 So. 2d 508 (La. App. 4 Cir 1996).
[9] *Xarelto*, 2017 WL 4517287 at *2.

doctrine states that prescription begins to run when a plaintiff has "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort."[10] This occurs "when the plaintiff has actual or constructive knowledge of a causal relationship between the object or product and the injury."[11] "There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run."[12] Rather, prescription begins to run "when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim."[13] Accordingly, to toll prescription, a plaintiff who suspects that something is wrong must act reasonably to discover the cause of the problem; otherwise, contra non valentem will not apply.[14] "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct."[15]

This Court agrees with Defendants that Plaintiff's case is prescribed on the face of the pleadings. Plaintiff identifies her injury as permanent chemotherapy-induced alopecia ("PCIA"). In her Short Form Complaint, she incorporates the Master Complaint, which defines PCIA as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."[16] Thibodeaux completed her chemotherapy treatment in June

---

[10] *Id.* (quoting *Bailey*, 891 So. 2d at 1276) (internal quotations omitted).
[11] *Id.*
[12] *Id.* (quoting Breaux v. Danek Med., No. 95-1730, 1999 WL 64929, at *6 (E.D. La. 1999)) (internal quotations omitted).
[13] Luckett v. Delta Airlines, Inc., 171 F.3d 295, 300 (5th Cir. 1999).
[14] *See* Chevron USA, Inc. v. Aker Maritime, Inc., 604 F. 3d 888, 894 (5th Cir. 2010).
[15] Campo v. Correa, 828 So. 2d 502, 511 (La. 2002).
[16] Doc. 4407.

4

2009,[17] which means that the one-year prescriptive period began in January 2010 and ended in January 2011. On the face of the pleadings, when Thibodeaux filed her complaint in October 2016, her case had prescribed.[18]

The Court further finds that contra non valentem is inapplicable. Thibodeaux had actual or constructive knowledge of a causal relationship between her injury and Taxotere, yet she did nothing to investigate. Thibodeaux testified that she attributed her hair loss to her chemotherapy treatment,[19] and she knew her hair loss had persisted beyond what she had expected—she expected it to regrow months after chemotherapy but instead found herself buying a new wig every three months for several years.[20] She had enough notice to excite her attention, but she did not act to discover the cause of the problem. She never inquired with her doctors even though, according to testimony from her dermatologist, she saw her dermatologist three times about unrelated matters.[21]

Thibodeaux testified that she assumed her health care providers knew that her hair had not returned because they saw her wearing wigs.[22] She

---

[17] Plaintiff's last Taxotere infusion was April 16, 2008, but Thibodeaux completed her overall chemotherapy treatment in June 2009. To be more generous to Thibodeaux, Defendants rely on the June 2009 date. The Court does the same.

[18] Even if the Court disregards the clear definition of PCIA provided in the pleadings as urged by Thibodeaux, the evidence shows that six months after treatment, Thibodeaux knew or should have known that her hair was not growing back and that it was because of her chemotherapy. She testified unequivocally that she "thought chemotherapy caused it to come out." Doc. 8976-2 at 216–17. She testified that she thought her hair "was going to come back after chemo, once chemo's completed, maybe a few months later." Doc. 8976-1 at 278–79. She testified that while she initially had some hair regrowth, her hair has been in the same state since "maybe [2010]." *Id.* at 276. During chemotherapy, Thibodeaux had taken a multi-vitamin in an effort to help her hair regrow, but by 2009 or 2010, she stopped taking it. She testified that she "was hoping that it would help my hair grow back, but it didn't." Doc. 8779-4 (p. 63). Considering the evidence, the Court finds that, Thibodeaux had sufficient knowledge of her injury and its causal connection to her chemotherapy regimen in early 2010.

[19] Doc. 8779-4 (p. 280–81).

[20] Doc. 9779-4 (p. 59).

[21] Doc. 8779-11.

[22] Doc. 8976-2 at 209–10.

5

further testified that she "didn't think to ask" her providers whether there was a way to treat her hair to make it regrow.[23] In her briefing, Thibodeaux points to testimony from her oncologist, who says she observed that Thibodeaux routinely wore a wig after chemotherapy.[24] This evidence carries no weight in the contra non valentem analysis. Thibodeaux cannot invoke contra non valentem simply because others observed her injury and could have offered unsolicited advice to help her but did not. This falls short of "act[ing] reasonably to discover the cause of the problem" as the law requires.[25]

Thibodeaux also asserts in her briefing that her mother and husband assured her that her hair would return, and because of this, she maintained a positive outlook and kept hoping her hair would regrow. The Court was unable to locate testimony of this nature in Thibodeaux's deposition, but even assuming its veracity, this is not the same as inquiring with a physician and, for example, reasonably relying on his or her medical opinion that hair regrowth may take some time.

Plaintiff notes that she signed an informed consent before treatment, and the form identified hair loss as a side effect. She vaguely states that "[a] patient's reliance upon the written warning information received from her medical provides is not unreasonable."[26] Thibodeaux seems to suggest that she kept believing her hair loss was temporary because the form had said it would be. She fails, however, to point to any testimony saying as much. Even if she did continue relying on the form as she waited for her hair to return, this reliance was unreasonable. If she remembered what the form said, this should have excited her attention and prompted an investigation.

---

[23] Doc. 8976-2 at 210.
[24] Doc. 8976-5 at 122.
[25] *See Chevron*, 604 F. 3d at 894.
[26] Doc. 8976 at 7.

Plaintiff argues that any investigation into her injury would have been futile. At oral argument, Plaintiff averred that because the company did not warn of permanent alopecia in its label, this knowledge was not available to Plaintiff or her doctor. The Court rejects this circular argument. Prescription cannot be tolled because the manufacturer did not issue an adequate warning.[27] If the manufacturer had issued an adequate warning about permanent hair loss, Plaintiff Thibodeaux would not have a failure to warn claim. Further, when a plaintiff demonstrates a lack of diligence as Thibodeaux has, claiming futility cannot relieve her of her duty to investigate.[28]

Similarly, Plaintiff avers that while she had been warned of the possibility of temporary hair loss, she was never warned of the possibility of permanent hair loss. She claims that when she saw the attorney advertisement in 2016, this was the first indication she had that her hair loss might be permanent. Plaintiff suggests that prescription could not run because she was not told her hair loss was permanent. Even if the Court disregards the definition of PCIA as manifesting six months after treatment, Plaintiff Thibodeaux at some point must have grown skeptical of the initial warning she had been given. When her hair did not grow back as she expected, she was on notice that something was amiss. Yet for several years she never raised this with her doctors.

Ultimately, Plaintiff has failed to point the Court to reasonable action that would toll the prescriptive period for her case. At some point, Plaintiff

---

[27] *See* Smith v. Regional Transit Authority, 827 F.3d 412, 422 n.8 (5th Cir. 2016) (finding contra non valentem inapplicable "where the only contention is that the Defendants failed to inform the Plaintiffs that a condition was permanent").

[28] Bartucci v. Jackson, 246 Fed. App'x 254, 258 (5th Cir. 2007) ("We do not know if Bartucci could have uncovered his memories had he attempted to do so in 1984; however, his failure to even try to discover what happened to him demonstrates a lack of diligence which precludes him from establishing an exception to prescription.").

7

should have investigated why her hair was not growing back. Her inaction is not the kind of conduct that warrants the application of contra non valentem. This Court refuses to find that Thibodeaux's prescriptive period was tolled until she learned through an attorney advertisement that she may have a claim for her permanent hair loss. Accordingly, her case is prescribed.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 8779) is **GRANTED**. Her case is **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 22nd day of January, 2020.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE