# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)  
PRODUCTS LIABILITY LITIGATION

**MDL NO. 2740**

**SECTION "H" (5)**

THIS DOCUMENT RELATES TO:  
ALL CASES

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO PRESERVE EXPERT TESTIMONY

The Plaintiffs' Steering Committee ("PSC"), without any meaningful meet-and-confer between the parties regarding the specifics of the proposal, has asked the Court to enter a proposed Case Management Order for the PSC to "preserve testimony of its general experts for the eventual use at trial in remanded cases by taking perpetuation depositions."[1] Defendants, Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc. ("Sanofi"); Sandoz Inc. ("Sandoz"), Accord Healthcare, Inc. ("Accord"); Hospira, Inc., Hospira Worldwide, LLC formally d/b/a Hospira Worldwide, Inc., and Pfizer, Inc. ("Hospira"); Sun Pharmaceuticals Industries, Inc. f/k/a Caraco Laboratories, Ltd. ("Sun"); McKesson Packaging Services, a division of McKesson Corporation ("McKesson"); Sagent Pharmaceuticals, Inc. ("Sagent"); and Actavis Pharma, Inc. and Actavis LLC ("Actavis") (collectively, "Defendants") vigorously oppose and respectfully request that this Court deny the PSC's Motion.

Here, the PSC's proposal for the preservation of expert testimony is inappropriate at this stage of proceedings in light of numerous considerations specific to this MDL:

- The proposal ignores the case-specific and time-specific aspects of each trial delving into the benefit-risk profile of the medicine to each woman diagnosed with breast cancer and her complaints about hair loss, thus severely prejudicing

---

[1] Rec. Doc. 12729-4, p.1.

1

Defendants' ability to effectively cross-examine Plaintiffs' experts generally and in the abstract. The proposal is improper, unfair, and unworkable.

- Also, as to the 505(b)(2) Defendants, PSC's proposal is unfair in additional, unique respects. Among other things, the 505(b)(2) Defendants have yet to have a trial; some 505(b)(2) defendants have filed *Daubert* motions on which no rulings have been made; and other 505(b)(2) defendants have not conducted expert discovery at all.

- Further, the specific proposal advanced by the PSC is inconsistent with the function of an MDL under 28 USC § 1407. It is also inconsistent with trial packages in prior MDLs even where those have been adopted.

- Finally, the PSC's proposal treats their own experts as "unavailable" in violation of the Federal Rules of Evidence. Its proposal is unworkable for the purposes of remand to various jurisdictions within 54 U.S. states and territories.[2]

For all of these reasons, the Court should deny the PSC's Motion.

## I. Factual Background

Preservation of testimony for remanded cases was first proposed by the PSC in October 2020. When initially raised, the PSC did not propose limiting testimony preservation to its general liability experts, nor did it propose preserving testimony by perpetuation depositions. Instead, the PSC's proposal contemplated using recorded witness testimony from the then-upcoming Trial 2A, which, at the time, was scheduled for February 1, 2021.[3] In fact, the PSC indicated that the issue was time sensitive because the upcoming trial was the sole opportunity for preservation and, yet, at the same time refused to provide defense counsel with details of the proposal. In December 2020, the trial date for Trial 2A was continued to Summer 2021, and the PSC ceased conferrals.

On May 21, 2021, the PSC again advised defense counsel that they would raise their "trial package" at the May 26, 2021, Lead and Liaison Counsel Conference, notwithstanding the absence of further conferrals or the PSC providing any additional details. On May 24, 2021, Plaintiffs filed

---

[2] Based on the PFS responses, this MDL includes at least one plaintiff for each state, plus DC, GU, VI, and PR.
[3] *See* CMO 27, Rec. Doc. 11691.

the instant Motion, attaching a proposed Case Management Order not previously seen, much less discussed with defense counsel.[4] The PSC's Motion identifies plaintiff experts proposed for perpetuation depositions, including Drs. Bosserman, Feigal, Madigan, Plunkett, and Ross.[5] The PSC's Motion ignores that each of these experts (except Dr. Ross) testified at trial, or by prior deposition, in terms uniquely tailored to the case-specific facts and timeframes of prior cases, distinctions true of their reports in Sanofi's *Earnest* trial and the putative *Kahn* trial as well.[6] Thus, without a meaningful opportunity to meet and confer, and over Defendants' objections, the PSC asks this Court to enter an Order that is impracticable.

## II. LAW AND ARGUMENT

### a. The PSC's Proposal is Not Feasible in this MDL because Cross-Examination of Plaintiffs' Expert Witnesses is Necessarily Case-Specific and Time-Specific.

In this MDL, the preservation of expert testimony for use in future trials following remand is inappropriate because it deprives Defendants of their opportunity to specifically tailor the cross-examination of Plaintiffs' experts to each individual case, including considerations involving the underlying disease, alternative treatment options, attendant risks, individual hair loss complaints, and time-specific considerations. The PSC acknowledges in its proposed Case Management Order that there are "varying years of usage of Taxotere or docetaxel by the large numbers of plaintiffs in this MDL."[7] The PSC's proposal does not, however, account for the numerous other substantive differences between the large number of plaintiffs in this MDL, nor does it address how the variability between the facts of these cases can be addressed at a single perpetuation deposition of

---

[4] Rec. Doc. 12729.
[5] Rec. Doc. 12729-1, p. 6-7.
[6] This is with the exception of Dr. Ross, who has now been retained by the PSC to replace Dr. David Kessler, the plaintiff's regulatory expert in the *Earnest* trial.
[7] Rec. Doc. 12729-4, p.2.

each of Plaintiffs' liability experts. Here, the cross-examination of Plaintiffs' liability experts is necessarily specific to each individual plaintiff's case for myriad reasons.

As this Court is aware, Taxotere (docetaxel) is a chemotherapy agent indicated for the treatment of breast cancer. It is used primarily in combination therapy, meaning that it is combined with other chemotherapy agents in various and distinct courses of treatment as prescribed by each patient's treating oncologist. Thus, although each of the plaintiffs in this litigation was administered Taxotere/docetaxel as part of her breast cancer treatment plan, the manner in which the Taxotere/docetaxel was administered to each individual plaintiff (including the dosage, regimen, and, importantly, other chemotherapy agents with which the Taxotere/docetaxel was combined, and other medications used sequentially) varies by plaintiff. The Court has issued extensive rulings on the ability of Defendants to cross-examine Plaintiffs' experts about side effects with such other medicines and their own reports of permanent hair loss, but specific to each Plaintiff's treatment.[8]

Another essential element of each individual plaintiff's claims is that, had her doctor been aware of the risk of permanent alopecia associated with Taxotere, he or she would have ultimately prescribed another chemotherapy treatment. Potential alternative treatments available to each plaintiff depend on their individual cancer diagnosis, comorbidities, and other pertinent medical history. This is particularly significant when considering the alleged injury—permanent or

---

[8] *See, e.g.*, Rec. Doc. 11684 (Order and Reasons denying Pl.'s Mot. Partial Summ. J. on Affirmative Defenses Concerning Alternative Causes (Rec. Doc. 10928) in the *Kahn* matter); *see also* Rec. Doc. 8201 (Order and Reasons on Motions *in Limine*), in which the Court ruled that, in the *Earnest* matter, Sanofi could cross-examine plaintiff's experts regarding the risk of neuropathy associated with Taxol, as well as plaintiff's family history of cancer, diagnosed medical conditions, and medications taken by plaintiff if "relevant to determining the cause of Plaintiff's hair loss"; *see also* Rec. Doc. 8198 (Order and Reasons on Motions *in Limine*), in which the Court ruled, also in the *Earnest* matter, that Sanofi could present evidence of risks associated with other medications taken by plaintiff or potential alternative chemotherapy agents that may have been options for her, and that Sanofi could likewise present evidence of Taxotere efficacy and its benefit-risk analysis compared to alternative chemotherapy treatments.

persisting alopecia—each individual's hair loss history, her use of hormone therapy, and any hair loss treatment or diagnosis.[9]

For these reasons, there have been no discovery depositions on "general causation." Plaintiff's attempt to label these witnesses "general" experts does not obviate the fact that Defendants' cross-examination of them has depended largely on case-specific factors that those experts failed to consider or account for in their opinions. The range of possible variations in factors relevant to the prescribing decision is enormous, and all the possibilities cannot possibly be foreseen without the context of case-specific facts. Thus, the PSC's characterization of these witnesses as "general" is fatuous.

As this Court is aware, Plaintiffs' expert Dr. Linda Bosserman repeatedly has disclaimed any general causation testimony. Instead, she attempts to characterize her opinions as general opinions about the standard of care for informed consent. Yet, in each case in which she has offered an expert report, she has walked in painstaking fashion through case-specific descriptions of the informed consent discussion between Plaintiff and her oncologist and then opined about what "could have been" included in such a discussion. That is not "general" testimony, and a "preservation" deposition could never afford Defendants an adequate opportunity for cross-examination on those opinions in remanded cases. The PSC is unfairly and unreasonably attempting to force Defendants in subsequently remanded cases to rely on a single seven-hour deposition to address all those possible case-specific factors and defenses.

In the first bellwether trial in the *Earnest* matter (which did not involve any 505(b)(2) defendant), for example, the majority of Sanofi's cross-examination of Dr. Bosserman focused on

---

[9] In the *Earnest* case, this Court granted Plaintiff's Motion *in Limine* to Exclude Evidence of Unrelated Medical Conditions, Familial Medical History of Cancer, and Unrelated Medication Usage (Rec. Doc. 7647) in part, holding that Sanofi could not cross-examine Plaintiff's expert witnesses about medications plaintiff did not use or medical conditions for which she did not have a diagnosis. *See* Rec. Doc. 8201 (Order and Reasons on Motions *in Limine*).

the treatment options available to plaintiff based on her diagnosis, and her individual medical history.[10] A single cross-examination of any of Plaintiffs' liability experts could not feasibly address the many *individualized* topics bearing on the issue of warnings causation, and certainly not cogently.

As another example, this Court is well-familiar with the opinions offered by Dr. Feigal and with the key cross-examination points raised by those Defendants who have even been afforded the opportunity. Defendants barely have been able to adequately cross-examine Dr. Feigal regarding a single plaintiff's other treatments and chemotherapy medications within the seven hours afforded by the Federal Rules because of the numerous medications she failed to consider in rendering her general causation opinions. They could not possibly be bound by a single deposition that would apply to all cases. There is no canned approach, or one-size fits all road map, for cross-examining these witnesses.

Questioning on the potential alternative causes of each plaintiff's alleged injuries—which are case-specific—is also critical to Defendants' defense at trial. Even questions posed to "general liability experts"—whether in terms of risks of alternative medicines, reasonable warnings, or causation with other medicines or agents—also focus on the specific medicines or agents that potentially caused that particular plaintiff's hair loss (e.g., another drug may have caused her hair loss and also carries more serious risks, which the plaintiff agreed to accept).

Further, each individual plaintiff in this litigation was prescribed Taxotere/docetaxel at a different point in time and by a different prescribing physician. Taxotere was first approved by FDA in 1996 and is still on the market today. Accordingly, what was known by each individual plaintiff's prescribing physician, the medical community, and the various manufacturers of

---

[10] *See* **Exhibit A**, Tr. at pp. 1281:8-1284:6 (Excerpts from Sanofi Defendants' Cross-Examination of Dr. Linda Bosserman).

Taxotere/docetaxel *at the time it was prescribed to each plaintiff* is necessarily specific to the timing of each individual plaintiff's prescription. Thus, it would be impossible for Defendants to effectively cross-examine Plaintiffs' liability experts across decades of evolving scientific and medical information. For the same reasons, the specific product labeling in effect at the time of each plaintiff's prescription is relevant. Defendants' cross-examination of Plaintiffs' experts will necessarily depend on the language in the label at the time of prescription and how each prescribing physician testified (s)he understood and interpreted that label and responded to any subsequent labelling revisions, if at all. Such examination cannot be accomplished in a single preservation deposition—particularly one applicable to all Defendants in any and potentially all future trials following remand.

The timing of an individual plaintiff's use of Taxotere/docetaxel is also important in connection with other alternative treatments that were available at the time when each plaintiff was treated for cancer. Various treatments carried numerous various risks that may have carried different weight for each patient, depending on their unique medical history. But not all alternative cancer treatments were available during the time 25 years (and counting) that Taxotere/docetaxel has been on the market.  To the extent that Plaintiffs' experts offer opinions that docetaxel carried risks that were greater, or different than, other available medications, the relevant cross-examination requires case-specific details regarding the time period of a particular plaintiff's treatment. Cross-examining an expert regarding all other available alternative treatments and their corresponding risks for a 25-year period is simply not feasible.

In addition to the differences between the timing of each individual plaintiff's prescription, the timing *of Defendant's cross-examination itself* is also significant. Here, Taxotere/docetaxel is still on the market for the treatment of breast cancer and is thus still being studied and tested,

including for efficacy. Science is constantly evolving, and Defendants will be severely prejudiced if their ability to cross-examine Plaintiffs' expert is limited to the information available to them at the time that the proposed perpetuation depositions take place. In other words, new scientific information will become available between the time perpetuation depositions are taken and the time individual cases see trial on remand. Defendants should not be limited in their ability to cross-examine Plaintiffs' expert witnesses with the most recent scientific evidence on the efficacy and safety profile of Taxotere/docetaxel, or proposed alternative.

For these reasons, in this MDL specifically, Plaintiffs' experts' testimony cannot be effectively "preserved" in a single perpetuation deposition for future use in a limitless number of trials following remand and, thus, Plaintiffs' proposal is unworkable. Defendants have the right to confront witnesses who are otherwise available in each trial or, else, the Plaintiffs would be precluded from calling such witnesses.

### b. The PSC's Proposal is Improper and Unworkable Overall and Disproportionately Prejudices the 505(b)(2) Defendants.

Another reason that Plaintiffs' proposal is improper, unworkable, and fundamentally unfair is the heightened prejudice that the entry of the proposed Case Management Order would have on the 505(b)(2) Defendants. The 505(b)(2) Defendants have never had a bellwether case go to trial, have no *Daubert* rulings on these experts, and, for some, have not conducted any expert discovery.  Though Defendants Sandoz and Accord have taken case-specific depositions of these experts, they have not conducted fulsome cross-examination at trial or even had rulings on the *Daubert* challenges those depositions raised.  Likewise, while Defendant Hospira has worked up cases through fact discovery, it has not yet had an opportunity to participate in expert discovery and, thus, the PSC's proposal would deprive it of any discovery depositions of experts entirely.  Having had no trial pool cases, Actavis, Sagent, McKesson, and Sun have not

participated in case-specific fact or expert discovery at all. Limiting the 505(b)(2) Defendants' ability to participate fully in all aspects of expert discovery would violate their due process rights.

The PSC's position—that merely reading transcripts of experts and/or being present at their deposition equates to participation in the process of expert discovery—has absolutely no legal support. There was no prior notice that these depositions—taken in other cases against other defendants—would apply to later cases against other 505(b)(2) defendants and limit the ability of those defendants to conduct their own depositions. The PSC's proposal would therefore deprive these defendants of their right to depose plaintiffs' experts before trial, as the Federal Rules of Civil Procedure do not distinguish between depositions taken for discovery purposes and those taken to perpetuate testimony for presentation at trial.[11] Moreover, the PSC's proposal compounds this prejudice because it would not even allow a representative of each Defendant to question the expert witnesses who will be testifying against their clients at putative trials. In other words, these defendants not only would be deprived of their ability to conduct discovery depositions, but also their ability to fully cross-examine these experts at the trial preservation depositions. As a result, the PSC's proposal thus must be rejected because it violates the Federal Rules of Civil Procedure and due process.

Further, the 505(b)(2) *Daubert* motions have never been ruled upon.[12] Those motions raised unique challenges to Plaintiffs' experts. The 505(b)(2) Defendants should not be required

---

[11] *Ashby v. Mortimer* 337 F.R.D. 652, 656 (D. Idaho Dec. 9, 2020) ("The Federal Rules of Civil Procedure do not distinguish between depositions taken for discovery purposes and those taken strictly to perpetuate testimony for presentation at trial.") (quoting *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 558 (S.D. Cal. 1999)); *see also Energex Enterprises, Inc. v. Shughart, Thomson & Kilroy, P.C.*, No. CIV. 04-1367 PHX ROS, 2006 WL 2401245, at *7 (D. Ariz. Aug. 17, 2006).

[12] The 505(b)(2) Defendants who briefed *Daubert* challenges in the *Stewart* and *Hughes* cases have presented challenges to the scope and admissibility of each of these experts' opinions. The other 505(b)(2) defendants have not even had the opportunity to depose these experts, much less present challenges to the admissibility or scope of these experts' testimony. In both cases, the defendants are entitled to have their challenges presented and ruled upon and the scope of permissible opinions determined before any preservation deposition could be taken.

to accept a "preservation" deposition (if at all) until the appropriate scope of testimony about each 505(b)(2) Defendant has been delineated by the Court, through rulings on their *Daubert* challenges. Among other things:

- All experts' opinions were founded on the actions and documents of innovator or brand name defendant, Sanofi. The experts substantially relied on Sanofi's internal documents and data, and submissions and communications to the FDA that are not publicly available. But, the 505(b)(2) Defendants did not have a right of reference to Sanofi's clinical studies or access to Sanofi's (or any other manufacturer's) internal documents. Nor can 505(b)(2) Defendants be imputed with another manufacturer's internal knowledge of a product. Therefore, all experts lacked foundation to express opinions about the 505(b)(2) Defendants and their approval pursuant to an abbreviated regulatory pathway.

- At the time of his initial disclosure, Dr. Ross was identified as an expert only for 505(b)(2) Defendants and solely focused on their regulatory obligations post-approval. He testified at depositions conducted by 505(b)(2) Defendants that he had no knowledge of when certain FDA submissions been made by Sanofi. He was subsequently identified as a replacement regulatory expert regarding Sanofi's Taxotere, so he presumably subsequently reviewed more regulatory history of docetaxel, except that inadequacies in his review and opinions are now subject to challenge by Sanofi. As importantly, since that time, he has not issued an updated 505(b)(2) expert report. The 505(b)(2) Defendants raised numerous challenges to Dr. Ross' proffered expert opinions that were never ruled on, either.

- Dr. Madigan's qualifications to render regulatory opinions, particularly as to the 505(b)(2) Defendants, have not been addressed. His opinions rely on information related to Sanofi and his ability to apply that information to 505(b)(2) Defendants was challenged.

- Dr. Plunkett's qualifications to render opinions on the distinction in obligations between 505(b)(1) and 505(b)(2) regulatory pathways have not been addressed. Her opinions relying on Sanofi's internal documents and reports and her ability to apply that reasoning to 505(b)(2) Defendants were challenged.

- Dr. Bosserman was identified as a case-specific expert and her reliance on Dr. Feigal's general opinions as a basis for her case-specific opinions was challenged.

- Dr. Feigal's reliance on Dr. Madigan's statistical analysis (including one statistical analysis excluded by the Court) was challenged.

Likewise, the experts substantially relied on opinions expressed by other experts, including some *not* identified in the proposed preservation order, as supporting bases for their own opinions. Defendants cannot be compelled to take and rely upon a preservation deposition of an expert who necessarily depends upon some other experts' opinions that are not being preserved. Each of these challenges—along with each challenge that may be brought by the 505(b)(2) defendants who have not yet conducted any expert discovery of their own—needs to be addressed and resolved before any preservation deposition could be contemplated.

      **c. Plaintiffs' Proposed Pretrial Order is Inconsistent with the Function of an MDL, the Purpose of an MDL Trial Package, and Trial Packages from Prior MDLs.**

In addition to the above reasons, the PSC's proposal is also inconsistent with the clear, overarching purpose of MDL proceedings under 28 USC § 1407, which is to consolidate *pretrial proceedings*.[13] Conversely, the PSC's proposal contemplates the preservation of *trial testimony* for use in ostensibly every future trial following remand—a purpose which falls outside of the

---

[13] Pursuant to 28 USC § 1407, when "civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated *pretrial proceedings*." 28 U.S.C.A. § 1407 (West 2021) (emphasis added).

purview of 28 USC § 1407. Although the PSC asserts that "[s]everal MDLs in the Eastern District, and elsewhere, have allowed general expert testimony to be preserved if relevant to all plaintiffs and will have a general and broad application[,]" it does not cite any specific authority for this proposition, particularly in circumstances where such an Order has been entered over the objections of Defendants.[14] Rather, in advocating for perpetuation depositions of Plaintiffs' expert witnesses, the PSC relies almost exclusively on secondary authority, including Judge Fallon's law review article, *Bellwether Trials in Multidistrict Litigation*.[15]

While Judge Fallon includes "deposition and trial testimony" as potential components of a trial package, the PSC misconstrues the purpose of the trial package articulated by Judge Fallon in the article.[16] The article begins by stating that the MDL process "has traditionally been limited to establishing a centralized forum where cases are consolidated so that coordinated *pretrial discovery* can proceed in an efficient and effective manner."[17] It continues:

> Ultimately, the availability of a trial package ensures that the *knowledge acquired by coordinating counsel* is not lost if a global resolution cannot be achieved in the transferee court. Trial packages also ensure that the products of *pretrial common discovery* do not overwhelm local counsel in the event that cases are remanded for trial. . . . Indeed, the creation of a complete trial package is tangible evidence that the transferee court's statutory role in overseeing pretrial discovery is nearing an end and the dissolution of the MDL is a real possibility.[18]

---

[14] Defendants are aware of Case Management Order 8 entered by Judge Fallon in the *In re Xarelto* MDL, but note that the Order specifically states that the Order on general expert trial preservation depositions and the corresponding deadlines was entered "by agreement of the parties." *In re Xarelto Prod. Liab. Litig.*, MDL 2592, Section L, 2:14-md-02592-EEF-MBN, Case Management Order No. 8, Rec. Doc. 12776 (E.D.La. March 7, 2019).

[15] Eldon E. Fallon et. al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2339 (2008) ("Trial packages come in different shapes and sizes, but typically will include various databases of material such as the relevant docu-ments [sic] acquired in discovery, other valuable background information, expert reports, deposition and trial testimony (both transcripts and video, if available), biographies of potential witnesses, transferee court rulings and transcripts, and the coordinating attorneys' work product and strategies with respect to all of this material.").

[16] Notably, Judge Fallon's article also specifically acknowledges that an MDL does not merge all the individual suits into a single case or "change the rights of the parties." *Id.* at 2330. Allowing the PSC to record a perpetuation deposition of its general liability experts and then play that testimony to various juries in remanded cases would do just that. Given the great variability of the cases in this MDL, as discussed above, allowing the testimony of a general liability expert to apply in *all future cases*, each with distinct factual issues, prejudices the Defendants in this litigation.

[17] *Id.* at 2324 (emphasis added).

[18] *Id.* at 2340 (emphasis added).

Judge Fallon is clear that the purpose of the trial package is to consolidate *pretrial discovery* in a manner that, upon remand, benefits individual plaintiffs' counsel with the knowledge gathered by coordinating counsel during pretrial proceedings. The article lists deposition and trial testimony among other work product compiled by coordinating counsel, which, ultimately, would never be shown to a jury—such as witness biographies and strategy documents. The trial package as described is simply an organized set of materials provided to individual plaintiffs' counsel, not evidence that can be "played" in any and every case upon remand. The article therefore does not support taking perpetuation depositions of Plaintiffs' experts for the express purpose of playing the experts' testimony back to juries in future jury trials.

Indeed, at the conclusion of prior MDLs, other MDL courts preparing "trial packages"[19] *did not* preserve expert testimony for use at trials on remand. For example, trial packages were also used in the *Avandia* MDL, which consisted of "expert reports on general causation and liability *and access to those experts*, transcripts and demonstratives from *Daubert* hearings, a database of documents that was sorted and indexed, deposition transcripts, the deposition 'cuts' the PSC had made, model motions in *limine* and model responses to defense motions in *limine*, and other MDL work product."[20] The *Avandia MDL* example not only excludes trial testimony of experts, but also specifically provides for "access to those experts," meaning that individual plaintiffs had an opportunity to retain MDL experts to testify in their cases on remand. Likewise, in the *In re Diet Drugs* MDL, the "trial package" consisted of:

> [A] database of the key documents in the litigation and the documents themselves, transcripts of all depositions taken, summaries, annotations, and video excerpts of key depositions, a narrative factual statement and time line of all relevant events,

---

[19] Notably, "trial packages" are not even used in all MDLs. *See In re Bard IVC Filters Prods. Liab. Litig.* (MDL No. 2641) (D. Ariz., J. Campbell) (no "trial package" used).

[20] See **Exhibit B**, *In re Avandia Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 07-MD-1871, 2015 WL 4480827, at *1 (E.D. Pa. July 21, 2015), *aff'd sub nom. In re Avandia Mktg. Sales Practices*, 658 F. App'x 29 (3d Cir. 2016) (emphasis added).

both with links to relevant documents, a Medical Science Literature Database containing over 2,000 relevant items, key MDL 1203 pretrial orders, defendants' answers to interrogatories, and sample in limine motions, trial briefs, and responses to defendants' *Daubert* motions.[21]

Further, none of these examples addresses how to avoid infringing the due process rights where there is a second group of defendants who have had limited participation in expert discovery. Thus, the PSC's Motion requests relief atypical of other trial packages and inconsistent with the *pretrial proceedings* purposes of an MDL Court.[22]

### d. The PSC's Proposal is Improper Under the Federal Rules of Evidence and Unworkable for Use at Trials in Various Jurisdictions on Remand.

The PSC's proposal also violates the requirements for available witnesses—and, thus, would do nothing more than expend party and Court time preserving inadmissible hearsay.[23] Federal Rule of Evidence 804(a) defines "unavailability" in the context of the hearsay exception where the witness, for example:

Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

Is absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision

---

[21] *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 2002 WL 32154197, at p. *19 (E.D. Pa. Oct. 3, 2002).

[22] Eldon E. Fallon et. al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2330 (2008). The PSC also relies on another law review article authored by Judge Rothstein regarding the *In re Phenylpropanolamine (PPA) Products Liability Litigation*, in which she elaborates on a "*alternative structure* for the management of mass tort cases" whereby the MDL process is used "to resolve fundamental disputes over common questions of scientific evidence." Barbara J. Rothstein et. al., *A Model Mass Tort: The PPA Experience,* 54 DRAKE L. REV. 621, 622-23 (2006) (emphasis added). Specifically, Judge Rothstein's article addresses a system implemented in the *PPA* MDL whereby general causation expert discovery would be handled by the MDL Court and specific causation discovery would be handled on remand. *Id.* at 629. Although this approach may have been appropriate in the context of the *PPA* MDL, where the injury was extremely narrowly defined (hemorrhagic stroke within 72 hours of ingestion), the PSC's reliance on this article in the context of this MDL is misplaced. The focus of Judge Rothstein's article is on the MDL Court's approach regarding *Daubert* rulings on admissibility and reliability of scientific evidence of general experts and how those rulings affected the use of expert testimony at trial on remand. Such an approach has not been contemplated by the Court or the parties to this MDL, nor is this approach outlined in the PSC's proposed Case Management Order; thus, this article does not support the PSC's proposal.

[23] *See* Unif. Rules of Evidence 74 Rule 801, 802.

(b)(2), (3), or (4), his attendance or testimony) by process or other reasonable means.[24]

Here, the PSC's proposal either offers very little useful, admissible evidence except in the unlikely circumstance of actual unavailability, or is intended to constitute some endorsement or ruling by this Court—the MDL Court—that the rules of unavailability and prohibitions on hearsay are to be overruled in the individual courts trying cases on remand. The former is a waste of this Court's and the parties' resources; to the extent the PSC's proposal is an invitation to the latter relief, the Court should reject it.[25]

By way of example, the Fifth Circuit sets strict standards for the use of depositions in place of live testimony at trial. In *Jauch v. Corley*, the Fifth Circuit held that "a deposition is an acceptable substitute for oral testimony when in-court observation of the witness is extremely difficult or virtually impossible."[26] Federal District Courts across the country have also specifically held that witnesses with busy schedules, or who are required to miss work in order to appear live, are not reasons to bend the rules when a party would like to call friendly but otherwise disposed witnesses.[27] These principles are particularly true for retained expert witnesses who are paid by the parties for the very purpose of providing testimony.

Moreover, the PSC's proposal poses fundamental problems of fairness and bilateralism. It does not indicate any kind of commitment or obligation by the PSC (or any individual plaintiff) that they *will not* call liability expert witnesses live at trial in future cases. Instead, the PSC would pick and choose when live testimony will be beneficial to their case but insist that the defense is

---

[24] *See* Unif. Rules of Evidence 74 Rule 804(a).

[25] *Id.*

[26] 830 F.2d 47, 50 (5th Cir. 1987). *See also Swearingen v. Gillar Home Health Care, LP,* 759 Fed.Appx. 322, 324 (5th Cir. 2019).

[27] *See, e.g., Stonestreet v. US*, 2021 WL 1268375 (S.D. Miss. Apr. 6, 2021); *Krase v. Jialiang Qi*, 2020 WL 4016250 (S.D. Ga. Jul. 16, 2020); *Hegwood v. Ross Stores, Inc.*, 2007 WL 102994 (N.D. Tex. Jan. 16, 2007). *See also Delgado v. City of El Campo*, 68 F.3d 471 (5th Cir. 1995).

stuck with the preservation deposition, both to avoid cost and/or in cases where the specific facts would make the experts' opinions particularly vulnerable to cross-examination. Under the PSC's proposal, it could have it both ways. Alternatively, Defendants propose that, in the event that a case is remanded, and any witness (expert or otherwise) is truly unavailable within the definition set forth in Federal Rule of Evidence 804, then a trial preservation deposition could be taken at that time. To do it at this point in the litigation is unwarranted.

Finally, Plaintiffs' proposal ignores the jurisdictional issues presented by using these proposed perpetuation depositions in various courts within 54 U.S. states and territories. Upon remand, the transferor court will be required to rule on the admissibility of expert testimony prior to trial based not just on the parties' *Daubert* Motions, but also on the individual jurisdiction's rules of evidence and substantive legal doctrines. It is therefore unsuitable for the MDL Court to determine the scope of expert testimony appropriate for trial in advance of remand to those jurisdictions. Rather, these determinations must necessarily be made by the transferor court when each individual case is properly before it.

This is a point specifically discussed in a case cited in the PSC's Motion, *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, in which the Court recognized the challenges it faced in addressing *Daubert* motions arising from preservation depositions of two specific experts.[28] The Court acknowledged its "concerns involving judicial administration[,]" including the differences in state substantive law, and the fact that such factors "may affect the substance of a particular civil action as it involves the content of the drug warnings and labels and other issues."[29] The Court further noted that "[t]he mechanics of the preparation of the preservation deposition should be such that depending on transferor court rulings as to relevancy, admissibility,

---

[28] No. MDL 1203, 2000 WL 876900, at *7 (E.D. Pa. June 20, 2000).
[29] *Id.*

and Rule 403 balancing, excerpts from portions of the preservation deposition—including questions, answers and possibly even exhibits—may have to be deleted or rearranged."[30] The Court continued:

> It is impossible to make such adjustments if many of these ideas and thoughts embodied in questions, answers and exhibits are so intertwined that redaction is either impossible, awkward or results in a confusing presentation in what remains of a preservation deposition to present to a jury after editing. Thus, aside from the content that can be a problem depending on where the case will be tried, and before which judge (who will rule on admissibility, relevancy and other factors), the actual structure of the document to be depicted on the video has to be taken into consideration at the time that it is prepared.[31]

Ultimately, the MDL Court declined to rule on the *Daubert* Motions, finding that there was no feasible way for it to exclude certain portions and grant the motion in part, but allow other portions and deny the motion in part.[32] "Chopping, cutting and pasting would be an arduous task and will probably distort the entire presentation in many portions that are to be conveyed by video."[33] This decision highlights just one aspect of the tremendous challenge presented by the proposed preservation depositions upon remand.

## CONCLUSION

By the instant motion, the PSC plainly is attempting to advantage plaintiffs strategically in remanded cases by immunizing their expert witnesses from case-specific cross-examination. Its proposal to do so is fundamentally inconsistent with the purposes of an MDL and the circumstances in which trial packages have been prepared in other MDLs. PSC's proposal would be highly prejudicial to defendants—and violate the due process rights of the 505(b)(2) Defendants who have had no trials, no *Daubert* rulings, and limited and varied opportunity to examine these

---

[30] *Id.*
[31] *Id.* at *8.
[32] *Id.*
[33] *Id.*

17

witnesses at all—and it is functionally unworkable for the 54 jurisdictions to which cases may be remanded.  For these reasons, as stated in more detail above, the Court should deny Plaintiffs' Motion.

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART &
MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and
Sanofi U.S. Services Inc.*

GREENBERG TRAURIG, LLP

/s/ *R. Clifton Merrell*
Lori G. Cohen
R. Clifton Merrell
Evan Holden
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: 678-553-2100
Facsimile: 678-553-2100
cohenl@gtlaw.com
merrellc@gtlaw.com
holdene@gtlaw.com

ADAMS AND REESE LLP

/s/ *Deborah B. Rouen*
Deborah B. Rouen
E. Paige Sensenbrenner
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
debbie.rouen@arlaw.com
paige.sensenbrenner@arlaw.com

*Attorneys for Sandoz Inc.*

TUCKER ELLIS LLP

*/s/ Julie A. Callsen*
Julie A. Callsen
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Telephone: 216-592-5000
Facsimile: 216-592-5009
Julie.callsen@tuckerellis.com

*Attorneys for Accord Healthcare, Inc.*

WILLIAMS & CONNOLLY LLP

/s/ *Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: 202-434-5000
Facsimile: 202-434-5029
hhubbard@wc.com
rmoore@wc.com
nwadhwani@wc.com

19

CHAFFE McCALL, L.L.P.

/s/ *John F. Olinde*
John F. Olinde
Peter J. Rotolo
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com
rotolo@chaffe.com

*Attorneys for Hospira, Inc., Hospira Worldwide, LLC formally d/b/a Hospira Worldwide, Inc., and Pfizer, Inc.*

HINSHAW & CULBERTSON LLP

/s/ *Geoffrey M. Coan*
Geoffrey M. Coan
Kathleen E. Kelly
53 State Street, 27th Floor
Boston, MA 02109
Telephone: 617-213-7000
Facsimile: 617-213-7001
gcoan@hinshawlaw.com
kekelly@hinshawlaw.com

*Attorneys for Sun Pharmaceuticals Industries, Inc. f/k/a Caraco Laboratories, Ltd.*

ULMER & BERNE LLP

/s/ *Michael J. Suffern*
Michael J. Suffern
Jennifer Snyder Heis
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Telephone: 513-698-5064
Telefax: 513-698-5065
msuffern@ulmer.com
jheis@ulmer.com

*Attorneys for Defendants Actavis LLC, Actavis Pharma, Inc., and Sagent Pharmaceuticals, Inc.*

MORRISON & FOERSTER LLP

/s/ *Julie Y. Park*
Erin M. Bosman
Julie Y. Park
12531 High Bluff Drive
San Diego, CA 92130
Telephone: 858.720.5100
Facsimile: 858.720.5125
EBosman@mofo.com
JuliePark@mofo.com

*Attorneys for Defendant McKesson Packaging Services, a division of McKesson Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*
Douglas J. Moore

# EXHIBIT A

Case 2:16-cv-17144-JTM-MBN Document 6-1 Filed 05/22/20 Page 23 of 35

08:48:06

1
UNITED STATES DISTRICT COURT

2
EASTERN DISTRICT OF LOUISIANA

3

4

5
IN RE:   TAXOTERE (DOCETAXEL)

6
         PRODUCTS LIABILITY          Docket No.: 16-MD-2740
         LITIGATION                  Section "H(5)"
                                     September 20, 2019
7
                                     New Orleans, Louisiana

8
*Relates To*:  *Barbara Earnest*,
*Case No.: 16-CV-17144*

9

10
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12
DAY 5, MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

14

15
APPEARANCES:

16
For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                           BY:  DAWN BARRIOS, ESQ.
17
                           701 Poydras Street
                           Suite 3650
18
                           New Orleans, Louisiana 70139

19

20
For the Plaintiffs:        Gainsburgh, Benjamin, David,
                             Meunier & Warshauer, LLC
21
                           BY:  PALMER LAMBERT, ESQ.
                           2800 Energy Centre
22
                           1100 Poydras Street
                           New Orleans, Louisiana 70163-2800
23

24

25

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:29:37 1 | Q. Doctor, can you tell the jury, please, what your opinion |
| 11:29:44 2 | is on the treatment options for stage II, ER/PR positive, HER2 |
| 11:29:52 3 | negative, early-stage breast cancer in the 2011 time frame? |
| 11:29:56 4 | A. So, in 2011, there were 13 proven effective regimens, and |
| 11:30:02 5 | a patient might choose any of those and expect an excellent, |
| 11:30:06 6 | high survival rate in the 95 to 98 percent range. So, there |
| 11:30:13 7 | are some, as you noticed on the top, that were preferred. |
| 11:30:17 8 | Those might be more chosen, but there is reason to choose |
| 11:30:21 9 | other. |
| 11:30:21 10 | So all are Category 1. All are approved by the |
| 11:30:24 11 | United States experts who are the breast cancer leaders for the |
| 11:30:29 12 | country for use in patients with this disease. |
| 11:30:32 13 | Q. Thank you, Dr. Bosserman. |
| 11:30:34 14 | MS. MENZIES: Nothing further at this time, Your Honor. |
| 11:30:36 15 | THE COURT: Mr. Strongman. |
| 11:30:39 16 | CROSS-EXAMINATION |
| 11:30:39 17 | BY MR. STRONGMAN: |
| 11:30:56 18 | Q. Good morning, Dr. Bosserman. How are you? |
| 11:30:57 19 | A. Good morning. |
| 11:30:58 20 | Q. Nice to see you again. |
| 11:31:00 21 | A. You, too. |
| 11:31:01 22 | Q. You and I had an opportunity to spend a good bit of time |
| 11:31:05 23 | together when I took your deposition, do you remember that? |
| 11:31:07 24 | A. I do. |
| 11:31:08 25 | Q. Now, I want to talk just a little bit about these |

*OFFICIAL TRANSCRIPT*

11:37:38  1    and regular AC, it's a timing issue, correct?

11:37:42  2    A.    Yes.

11:37:42  3    Q.    So it's every two weeks, correct, for dose dense?

11:37:46  4    Correct?

11:37:46  5    A.    Correct.  It means that the whole regimen is done really

11:37:54  6    in about -- it's eight total cycles, 16 weeks, as opposed to

11:38:01  7    about 24 weeks.

11:38:01  8    Q.    Doctor, when you were being asked questions by

11:38:07  9    Ms. Menzies, what regimen did you say Barbara Earnest received?

11:38:10  10   A.    She received the AC followed by docetaxel regimen.

11:38:14  11   Q.    Now, the truth is, Doctor -- did you look at Ms. Earnest's

11:38:18  12   medical records?

11:38:19  13   A.    I did.

11:38:19  14   Q.    The truth is, Ms. Earnest actually got dose-dense AC

11:38:26  15   followed by Taxotere, correct?

11:38:28  16   A.    Yes.  I haven't really looked at that, to be honest,

11:38:33  17   today.

11:38:33  18   Q.    The answer is yes, correct?

11:38:35  19   A.    I actually didn't look at that dose yesterday when I was

11:38:39  20   reviewing that case, so I would have to look at that.

11:38:40  21   Q.    Certainly when you were asked questions by Ms. Menzies

11:38:43  22   about the dose and the regimen that Ms. Earnest got, you didn't

11:38:46  23   mention dose dense, correct?

11:38:49  24   A.    I didn't mention it, no.

11:38:50  25   Q.    And you pointed to one of the specific regimens on the

*OFFICIAL TRANSCRIPT*

11:38:53 1    NCCN Guidelines for Ms. Earnest, correct?

11:38:57 2    A.    Yes.  It's considered completely acceptable to use

11:39:01 3    dose-dense AC with docetaxel.  It just didn't get called out in

11:39:04 4    the regimen sheet.

11:39:05 5    Q.    Doctor, do you even know, sitting here today, whether or

11:39:09 6    not Ms. Earnest got dose-dense AC --

11:39:12 7    A.    I would have to look at my notes.

11:39:13 8    Q.    -- followed by Taxotere?

11:39:14 9    A.    I would have to look at my notes.  You have those.  Could

11:39:16 10   you show them to me.  I'll tell you right away.

11:39:19 11   Q.    Can you answer that question one way or the other, sitting

11:39:22 12   here?

11:39:22 13   A.    I would have to look at my notes to tell you that.

11:39:24 14   Q.    So you don't have that information in front of you?

11:39:24 15          MS. MENZIES:  Objection, Your Honor, asked and

11:39:28 16   answered.

11:39:29 17          THE COURT:  Sustained.  It's been asked and answered.

11:39:31 18   EXAMINATION BY MR. STRONGMAN:

11:39:39 19   Q.    Now, Dr. Bosserman, you talked about your experience,

11:39:48 20   correct?

11:39:48 21   A.    Yes.

11:39:49 22   Q.    And you have experience with Taxotere, correct?

11:39:55 23   A.    Yes.

11:39:55 24   Q.    And you have experience treating patients with Taxotere;

11:39:59 25   is that right?

*OFFICIAL TRANSCRIPT*

11:39:59  1   A.   I do.

11:40:00  2   Q.   And you prescribed Taxotere to patients with early-stage

11:40:04  3   stage II breast cancer, correct?

11:40:05  4   A.   I have.

11:40:06  5   Q.   And in your patients, Taxotere has been an effective

11:40:11  6   regimen for them, correct?

11:40:12  7   A.   Taxotere is a proven effective drug in breast cancer.

11:40:15  8   Q.   Certainly, Doctor, you're not coming in here today to make

11:40:23  9   any kind of implication that Ms. Earnest shouldn't have had

11:40:27 10   chemotherapy, correct?

11:40:29 11   A.   Correct.

11:40:29 12   Q.   And what we know is that if a patient came in to see you

11:40:34 13   with stage II cancer, the type that Ms. Earnest had, you would

11:40:39 14   recommend both chemotherapy and endocrine therapy, correct?

11:40:46 15   A.   Today?  2011?

11:40:48 16   Q.   I'm saying if Ms. Earnest walked into your office in

11:40:51 17   2011 --

11:40:52 18   A.   We would definitely be discussing chemotherapy and

11:40:56 19   endocrine therapy.

11:40:57 20   Q.   And what we know is that when it comes to breast cancer,

11:41:02 21   the first shot is the best shot, correct?

11:41:05 22   A.   That is true.

11:41:06 23   Q.   And getting the right treatment for the right disease is

11:41:09 24   really important from the beginning, correct?

11:41:11 25   A.   That is true.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:41:13 | 1 |
| 11:41:16 | 2 |
| 11:41:22 | 3 |
| 11:41:28 | 4 |
| 11:41:30 | 5 |
| 11:41:34 | 6 |
| 11:41:39 | 7 |
| 11:41:39 | 8 |
| 11:41:43 | 9 |
| 11:41:42 | 10 |
| 11:41:43 | 11 |
| 11:41:43 | 12 |
| 11:41:51 | 13 |
| 11:41:59 | 14 |
| 11:42:01 | 15 |
| 11:42:04 | 16 |
| 11:42:07 | 17 |
| 11:42:10 | 18 |
| 11:42:13 | 19 |
| 11:42:17 | 20 |
| 11:42:18 | 21 |
| 11:42:20 | 22 |
| 11:42:27 | 23 |
| 11:42:29 | 24 |
| 11:42:33 | 25 |

1  Q.   Because if you don't, you would certainly agree with me

2  that recurrent breast cancer puts a patient in an entirely

3  different category in terms of survival than someone who has

4  not had a recurrence, correct?

5  A.   Correct.

6       MR. STRONGMAN:  I have no other questions.

7       THE COURT:  Thank you.

8            Ms. Menzies.

9       MS. MENZIES:  Thank you, Your Honor.  Just a couple.

10                   REDIRECT EXAMINATION

11  BY MS. MENZIES:

12  Q.   Dr. Bosserman, we talked about all the different

13  treatments.  Are these all available treatment options

14  acceptable under the NCCN Guidelines?

15  A.   They are all acceptable under NCCN.

16  Q.   Why are there so many different options endorsed by the

17  NCCN?

18  A.   They are there because they are effective, and different

19  patients may have different priorities and want to make

20  different choices.

21       So the important thing is to be able to talk about

22  each regimen, what the pros and cons, what the risks,

23  short-term and long-term, are, and find out from the patient

24  what their priorities are because all of them can improve the

25  survival of breast cancer patients.

                         *OFFICIAL TRANSCRIPT*

# EXHIBIT B

2015 WL 4480827
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re AVANDIA MARKETING,
SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION.
This Document Applies to: All Actions.

MDL No. 1871.
|
No. 07–MD–1871.
|
Signed July 21, 2015.

**MEMORANDUM OPINION**

RUFE, District Judge.

**\*1** In February 2015, the Plaintiffs Advisory Committee ("PAC") in the federal Avandia Multi–District Litigation ("MDL") filed a motion for an order to show cause why claims settled in the Illinois state court A vandia action captioned *Gabel v. GlaxoSmithKline* should not be considered "covered claims" subject to the Avandia MDL common benefit assessment, pursuant to Pre–Trial Order Number 70 ("PTO 70"). The Court issued the requested order to show cause. Lead counsel for the Gabel plaintiffs, the Law Offices of Steven M. Johnson, P.C. ("Johnson Firm"), contests the MDL Court's jurisdiction to enter or enforce any orders reaching it or its clients. The parties briefed the relevant issues, and the Court held a hearing on April 22, 2015, at which attorneys Michael Baum and Erick Rosemond testified as fact witnesses.

**I.** *Background*
The Avandia MDL was created in 2007 to consolidate, for pretrial proceedings, all product liability cases against GlaxoSmithKline, the maker of Avandia, filed in or properly removed to federal court. This Court, which oversees the Avandia MDL, created a Plaintiff's Steering Committee ("PSC"), which spent years conducting fact and expert discovery and briefing pretrial motions.[1] On August 26, 2009, the Court entered Pretrial Order 70 ("PTO 70"), establishing

the Avandia common benefit fund. This is a funding mechanism to reimburse plaintiffs' lawyers (including but not limited to PSC members) for expenses and time spent conducting discovery and litigating legal issues for the common benefit of all MDL plaintiffs.

Although all federal cases were consolidated in the MDL, thousands of Avandia cases were litigated in state courts. In some state court cases, plaintiffs' counsel entered into voluntary Attorney Participation Agreements with the PSC, agreeing to pay an assessment to the Fund, as outlined in PTO 70, in exchange for access to the MDL common benefit work product.[2] By its express terms, once counsel signs on to the Attorney Participation Agreement, all Avandia claims in which counsel has a financial interest (including filed state and federal claims, as well as tolled and unfiled claims) are "covered claims," subject to a common benefit fund assessment. PTO 70 further provides that a total assessment of 7% of gross monetary recovery applies to all covered claims, with 4% deducted from attorneys' fees and 3% from the clients' shares of the recovery.

In 2009, the Johnson Firm filed a multi-plaintiff lawsuit, *Gabel v. GlaxoSmithKline,* in Illinois state court. The Complaint alleged that the claimants had been injured by the ingestion of Avandia. The *Gabel* case was litigated exclusively in state court; neither the individual plaintiffs nor the Johnson Firm litigated any Avandia claims in federal court.

In Spring 2012, Johnson attended an Avandia litigation meeting led by Paul Kiesel, who had been appointed by this Court as coordinating counsel for the MDL.[3] The meeting was convened after thousands of MDL cases and claims had been settled, for the purpose of distributing the MDL's work product, dubbed "trial in a box," to attorneys still litigating Avandia cases in state courts.[4] Kiesel announced that he would be circulating paperwork (the PTO 70 Participation Agreement and the PTO 10 Confidentiality Agreement), which the attorneys present should sign as a prerequisite to obtaining the MDL "trial in a box" flash drives being distributed at the meeting.[5]

**\*2** During that conference, Johnson met with Michael Baum of the law firm Baum, Hedlund, Aristel & Goldman ("Baum") and Erick Rosemond of Rosemond Law Group, P.C. ("Rosemond"), both of whom had cases in the MDL, had signed the PTO 10 Confidentiality Agreement and the PTO 70

In re Avandia Marketing, Sales Practices, and Products..., Not Reported in...

Case 2:18-02741-MMBN Document 6-9 Filed 05/22/26 Page 35 of 7

Attorney Participation Agreement in the course of litigating those cases, and had performed common benefit work for the MDL. As signatories to the Participation Agreement, Baum and Rosemond agreed to pay "the assessment amount provided in paragraph 4 of [PTO 70] on all filed and unfiled cases or claims in state or federal court in which they share a fee interest."

Knowing of Baum and Rosemond's connection to the MDL, and "hopeful that by having a trial team, it would enable him to get the type of settlements he thought his cases ought to receive,"[6] Johnson asked Baum and Rosemond to serve as trial counsel in *Gabel*. Rosemond testified that Johnson understood that Rosemond "had worked extensively with the PSC, knew the PSC's work product and was well positioned to go get his cases ready for trial."[7] Baum testified that Johnson understood that if he retained Baum and Rosemond as trial counsel, they would use the MDL work product in *Gabel* and a common benefit assessment would be owed from any recovery or settlement.[8] Baum and Rosemond agreed to assist as trial counsel, and they filed *pro hac vice* motions and entered appearances in the *Gabel* case.

Baum testified that he proposed a fee split of the Johnson Firm's contractual contingency fee agreements, based upon which Baum believed that he would receive 75% of fees obtained from bellwether trials, and 10% of fees from all other cases in the *Gabel* litigation.[9] Email communications between Baum and Johnson regarding fee sharing again made it clear that trial counsel were planning to use the MDL trial in a box and other work product, and indicated that trial counsel's fees would be calculated on the balance of the fees remaining after subtracting the debt owed to the PSC for the use of the MDL work product.[10] Although trial counsel believed they had reached a fee-sharing agreement with the Johnson Firm via email, and began conducting depositions and working up cases for the *Gabel* trials based upon this belief, the feesharing agreement was not formalized by the parties. Baum testified that he was reimbursed for expenses incurred litigating the *Gabel* case (nearly $200,000), and received 75% of the fees generated from the trial pick cases, but the division of fees for the other settled claims is currently being litigated in state court.[11]

The judge in the *Gabel* case had scheduled trials beginning in the fall of 2012, and so Baum and Rosemond immediately began to prepare for trial. Baum testified that he reviewed Johnson's entire inventory of cases, and identified cases which

would make viable bellwether cases. Baum testified that "neither Mr. Johnson nor his local counsel knew enough about the science and mechanisms of liability in the cases to figure out which ones would be good bellwethers and they, in fact, had selected some that were not suitable."[12] Baum testified that because of the short time frame, counsel all agreed that trial counsel would be using the MDL "trial in a box," including the MDL's experts and their reports, and other MDL work product.[13] He further testified that he explained to Johnson, in an email, that because they were relying upon MDL work product, the cases in the *Gabel* case would be subject to the common benefit fund assessment, although they could discuss the possibility of a set-off or reduction of the assessment required by PTO 70 with the MDL PAC.[14] The relevant email chain was introduced into evidence at the hearing (PSC Exhibit 6). In preparing for the *Gabel* trials, Baum relied primarily upon the MDL database of discovery documents, which had been assembled, coded, and organized by the PSC, rather than the discovery produced directly to the Johnson Firm from GSK.[15] He worked with the MDL experts to provide updated reports, incorporating new research and regulatory findings.[16] And he and Rosemond used MDL work product to support successful motions to take the deposition of the CEO of GSK or a surrogate.[17] Rosemond also testified that he used the MDL work product extensively in his capacity as trial counsel for the *Gabel* cases.[18]

**\*3** Late in 2012, before any trial began, but while Baum was "feverishly getting all of the last bits of trial prep done, all the last bits of motions, motions in limine, summary judgment oppositions, the depo designations ...,"[19] the Johnson Firm was, unbeknownst to Baum, negotiating a master settlement agreement with GSK. By December 10, 2012, the Johnson Firm had reached an agreement in principle with GSK to settle the claims asserted on behalf of the *Gabel* plaintiffs, although the details of that agreement were not worked out for some time. Rosemond testified that because they had been getting a case ready for trial, the *Gabel* plaintiffs received a more favorable settlement than any they had been offered prior to Baum and Rosemond's involvement.[20]

In January 2015, the Illinois state court entered an order requiring GSK to hold 7% of the *Gabel* settlement fund in reserve, pending disposition of any MDL common benefit fund obligations under the MDL's PTO 70. Pursuant to that order, the reserved funds are being held in an attorney trust account in Philadelphia. The Illinois court scheduled a

hearing to determine whether Johnson and its clients were obligated to pay a common benefit assessment to the MDL's common benefit fund, pursuant to PTO 70. Before the Illinois court could hold that hearing, however, the PAC moved for an order to show cause why the MDL Court should not interpret its own order and determine whether a common benefit assessment is owed. The Court issued the order to show cause.

In response, trial counsel for the *Gabel* case, Baum and Rosemond, filed declarations stating that their firms did not dispute their obligations to pay an assessment on all state and federal claims in which they had a fee interest, including the *Gabel* claims. Local (Illinois) counsel[21] for the *Gabel* case, Robert G. Jones, The Jones Law Firm, P.C., and David R. Jones, also filed a declaration indicating that they did not oppose payment of the common benefit fees to the PAC.

The Johnson Firm responded by challenging the Court's jurisdiction over it and its clients. Specifically, the Johnson Firm challenges both the Court's power and jurisdiction to issue an MDL order which purports to reach purely state court actions, and the Court's jurisdiction to enforce PTO 70 with regard to the *Gabel* settlement. The Court held a hearing, at which evidence was presented on the issue of the Court's jurisdiction to issue and enforce PTO 70.

## II. *Discussion*

### A. *Jurisdiction*

As stated above, the Johnson Firm argues that the Court lacked the power to issue PTO 70 to the extent that it purports to govern law firms and claimants not participating in the MDL.[22]

In a recently issued non-precedential opinion, the Third Circuit ruled that it was within this Court's power to issue PTO 70, and that the Court has jurisdiction to determine whether the terms of PTO 70 have been violated when a member of the law firm against whom the PAC is seeking an assessment has signed an Attorney Participation Agreement.[23] In that matter, the Girardi Keese law firm argued that its state court Avandia claims should not be subject to the MDL's Common Benefit Assessment, and that the Court lacked jurisdiction to order GSK to hold back the 7% assessment.[24] The Court disagreed, and the Third Circuit affirmed the Court's ruling on appeal.

**\*4** The Third Circuit recognized that 28 U.S.C. § 1407 does not expand the jurisdiction of a district court overseeing multi-district litigation, but noted that, when supervising an MDL, a district court is expected to craft a plaintiff's leadership organization to assist with case management, and to fashion some way of compensating attorneys who provide a common benefit to all plaintiffs.[25] The Third Circuit went on to say:

> Here, the District Court issued an order—Pretrial Order 70 —dictating how it would allow the leadership organization —the Steering Committee—to be compensated. One way was to assess a percentage of recovery of the cases before the MDL. The District Court also permitted the Steering Committee to, essentially, trade work product for a share in the recovery in cases *not* before the MDL. The District Court identified a form agreement that the Steering Committee and interested counsel must use to participate in the common benefit scheme and "incorporated" the agreement into the Order.

> When a district court incorporates the terms of an agreement into a court order, a breach of the agreement would be a violation of the order. Because a district court has jurisdiction to determine whether one of its orders has been violated, it may adjudicate whether an agreement incorporated into a court order has been breached.[26]

The Third Circuit explained that:

> the [Attorney Participation A]greement itself is not the source of the District Court's authority. Rather, the District Court's authority over this dispute arose from its responsibilities to appoint and supervise a coordinating committee of counsel. The agreement was simply incorporated into an order the District Court was empowered to issue.

> Because it was within the District Court's power to issue an order governing how to compensate the Steering Committee for its work, and because Girardi Keese's Attorney Participation Agreement was incorporated into the order, the District Court had jurisdiction to adjudicate whether Girardi Keese breached the Attorney Participation Agreement and thereby violated Pretrial Order 70.[27]

This ruling from the Third Circuit affirms the Court's power to issue PTO 70, an order which applies to both MDL claims and certain state court claims.

Whether the Court has the jurisdiction to enforce PTO 70 against the Johnson Firm, which may not have signed the Attorney Participation Agreement, and the *Gabel* plaintiffs', presents a close question even in light of the Third Circuit's recent decision. At the April 22, 2015 hearing, the PAC put forth no evidence that a member of the Johnson firm signed the Attorney Participation Agreement. However, the PAC has argued that, regardless of whether a member of the Johnson Firm personally signed the Attorney Participation Agreement, the firm in effect agreed to be bound by that agreement and by PTO 70. The Johnson Firm knew that signing the agreement was a prerequisite to receipt of MDL work product, and it chose to have Baum and Rosemond enter appearances as trial counsel in the *Gabel* case, knowing they were signatories to the Attorney Participation Agreement, for the express purpose of benefitting from their experience with the MDL and their access to and familiarity with MDL work product.

 **\*5** Thus, the PAC argues, the MDL court has jurisdiction to adjudicate whether the Johnson Firm owes a common benefit assessment.

The Court finds the PAC's evidence and argument persuasive. At the April 22, 2105 hearing, the Court heard credible evidence that the Johnson Firm was advised that the MDL leadership would only release MDL work product to state court counsel who signed the Attorney Participation Agreement, which is incorporated into PTO 70. The Court also heard credible evidence that the Johnson Firm, which voluntarily retained Baum and Rosemond as trial counsel for the *Gabel* case, knew that: 1) both the Baum and Rosemond firms were signatories to and bound by an Attorney Participation Agreement and PTO 70; 2) PSC work product, including the "trial in a box" disseminated to those who signed an Attorney Participation Agreement at a meeting Johnson attended, would be used in *Gabel* if the Johnson Firm retained Baum and Rosemond as trial counsel; and 3) that each of the state court claims would be subject to a common benefit assessment pursuant to PTO 70.[28] The Court finds that the Johnson Firm intentionally sought out and then relied upon the MDL work product to advance the *Gabel* litigation, knowing that, in doing so, it was obligating itself to pay a common benefit assessment. The availability of the Avandia MDL PSC's work product, which has been offered to state court counsel with restrictions and conditions established by the MDL parties and adopted by Order of the MDL Court, does not, and should not, allow windfall opportunities to state court litigators to benefit from this work

product without fair consideration. In light of the evidence, the Court holds that the Johnson Firm agreed to be bound by the Attorney Participation Agreement and PTO 70 through its voluntary association with Attorney Participation Agreement signatories Baum and Rosemond in the *Gabel* litigation. Therefore, the Court holds that it has jurisdiction over the Johnson Firm, for the purpose of determining whether it owes a Common Benefit Assessment pursuant to the Attorney Participation Agreement and PTO 70.

The Johnson Firm also argues that the Court does not have jurisdiction over its clients, the plaintiffs in the *Gabel* case, and therefore it cannot order the clients to pay their 3% share of the common benefit assessment. The Johnson Firm correctly points out that the Court has heard no evidence that the individual claimants in the *Gabel* case agreed to be bound by the Attorney Participation Agreements that Baum and Rosemond entered into prior to being retained in the *Gabel* case. However, the Court need not determine whether it has jurisdiction over the individual *Gabel* plaintiffs. Consistent with the guidance provided by the Third Circuit in its recent opinion, the Court holds that it has jurisdiction to order GSK to withhold from the *Gabel* settlement funds the full 7% assessment contemplated by PTO 70, as Third Circuit held that counsel for the settling state court claimants "promised to contribute the entire [common benefit] assessment, and the District Court could ensure that it complied with the agreement and Pretrial Order 70. Whether [counsel] must reimburse its clients for that share of the assessment is a question governed by the representation agreement between [counsel] and its clients."[29]

### B. *Applicability of PTO 70 to the Gabel Claims*
 **\*6** Although the Johnson Firm appeared before the Court for the sole purpose of challenging the Court's jurisdiction, in this case, the facts upon which the Court relied in concluding that PTO 70 can validly apply to the *Gabel* case also support the conclusion that a common benefit assessment is owed. Indeed, at the hearing, counsel for the Johnson Firm stated: "I am not presenting any question of the interpretation of PTO 70.... My question is exclusively whether or not PTO 70 can validly apply to a state court case over which there is no subject matter jurisdiction.... I have assumed all along that the drafters and Your Honor intend PTO 70 to apply to these cases."[30] The Court having found that PTO 70 can validly apply to the Johnson Firm and the *Gabel* case, and there being no other dispute as to the obligation to pay the common benefit assessment, and given that trial counsel Baum and

Rosemond signed the Attorney Participation Agreement, the Johnson Firm retained Baum and Rosemond to serve as trial counsel in the *Gabel* litigation, and the PSC's work product was used for the benefit of the *Gabel* plaintiffs, the Court will order the payment of the common benefit assessment on all cases in which any of these counsel had a fee interest, pursuant to PTO 70.

III. *Conclusion*

For the reasons set forth above, the Court holds that it has jurisdiction over the Johnson Firm for the purpose of interpreting PTO 70 and determining whether an assessment is owed to the Common Benefit Fund, pursuant to PTO 70, for the settled *Gabel* claims. The Court further holds that, pursuant to PTO 70, a 7% assessment to the Common Benefit Fund is owed on all settled claims in the *Gabel* case. An appropriate Order follows.

### *ORDER*

**AND NOW,** this 21st day of July 2015, upon consideration of the briefing in response to the Court's February 26, 2015 Order to Show Cause, and after a hearing on the jurisdictional issues, and for the reasons set forth in the accompanying memorandum opinion, it is hereby **ORDERED** as follows:

1) The Court properly exercised its jurisdiction in enacting PTO 70;

2) The Johnson Firm implicitly entered into a contract with the MDL Plaintiffs' Steering Committee, agreeing to be bound by the terms of the Attorney Participation Agreement and

PTO 70 in exchange for access to MDL work product, by its conduct, including retaining signatories Baum and Rosemond as trial counsel, and extensively using MDL work product to advance the *Gabel* cases;

3) Given the implicit agreement by the Johnson Firm to be bound by the Attorney Participation Agreement and PTO 70, and the express agreement to be bound signed by the retained trial counsel Baum and Rosemond, the Court has jurisdiction to determine whether PTO 70 has been violated, or the Attorney Participation Agreement has been breached;

4) The Court holds that all settled claims in the *Gabel v. GlaxoSmithKline* litigation in which Baum, Rosemond, or the Johnson Firm hold a financial interest are "assessed cases" and "covered claims" as defined by the terms of the Attorney Participation Agreement and PTO 70, and are thus subject to a Common Benefit Assessment under PTO 70;

 **\*7** 5) GSK has held back a 7% assessment on the gross recovery. This money shall be deposited in the Avandia Common Benefit Fund.

The related Motions for Permanent Injunction [Doc. No. 4411], for Expedited Discovery [Doc. No. 4423], and for Service by Alternate Means [Doc. No. 4523] are **DISMISSED** as moot.

It is so **ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4480827

---

Footnotes

1    After thousands of claims were settled in early 2012, the Court terminated the PSC. The Court created the PAC to ensure that a small number of PSC members with valuable historical knowledge about the MDL would remain available to serve the litigation, in a limited, advisory capacity, after settling their claims.

2    *See* PTO 70 and its attachments.

3    April 22, 2015 Hearing Tr. at 28–30.

4    Baum and Rosemond testified that the "trial in a box" included expert reports on general causation and liability and access to those experts, transcripts and demonstratives from *Daubert* hearings, a database of documents that was sorted and indexed, deposition transcripts, the deposition "cuts" the PSC had made, model motions *in limine* and model responses to defense motions *in limine,* and other MDL work product.

5    Hearing Tr. at 30.

6    Hearing Tr. at 35 (testimony of Baum); see also Hearing Tr. at 62–63 (testimony of Rosemond).

7    Hearing Tr. at 63.

8    Hearing Tr. at 37.

Case 2:13-02740-MBN Document 6-9 Filed 05/22/21 Page 35 of 7

In re Avandia Marketing, Sales Practices, and Products..., Not Reported in...

9   Hearing Tr. at 35–36.

10  Hearing Tr. at 35–36.

11  Hearing Tr. at 36, 41–42.

12  Hearing Tr. at 39.

13  Hearing Tr. at 35.

14  Hearing Tr. at 36–38.

15  Hearing Tr. at 40–41.

16  Hearing Tr. at 39–40.

17  Hearing Tr. at 64–65.

18  Hearing Tr. at 64.

19  Hearing Tr. at 43.

20  Hearing Tr. at 68.

21  The Johnson Firm is a Texas-based law firm.

22  See Hearing Tr. at 22.

23  *In re: Avandia Marketing, Sales Practices and Products Liability Litigation,* Case No. 14–2980, 2015 WL 4036209 (3d Cir. July 2, 2015).

24  PTO 70 provides that a law firm and its clients owe a common benefit assessment if: 1) the law firm has any cases in the MDL; 2) the law firm signed the Endorsement of Protective Order attached to PTO 10; 3) the law firm signed the voluntary Attorney Participation Agreement associated with PTO 70. In the Girardi Keese matter, the law firm had cases in the MDL and signed an Attorney Participation Agreement which was later associated with PTO 70.

25  *See* 2015 WL 4036209, at *4, citing *In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 547 (3d Cir.2009).

26  2015 WL 4036209, at *4–5 (internal quotations and citations omitted).

27  2015 WL 4036209, at *6.

28  The Court is unable to determine, from the record before it, whether the Johnson Firm informed the *Gabel* plaintiffs that it had retained Baum and Rosemond as trial counsel.

29  2015 WL 4036209, at *6, n. 5.

30  Hearing Tr. at 91.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.